**Stuart Y. SILVERSTEIN, Plaintiff,**

v.

**PENGUIN PUTNAM, INC., Defendant.**

**No. 01 Civ. 309(JFK).**

United States District Court,
S.D. New York.

Nov. 7, 2007.

**58.** *Id.*

**59.** *See* 15 U.S.C. § 2607(e).

**60.** *See* Energy Policy Act of 2005, Pub.L. No. 109–58, 119 Stat. 594 (2005).

**61.** *See, e.g., In re MTBE,* at 305–19.

**62.** *Id.* at 300–01.

**63.** *Id.*

Mark A. Rabinowitz, Christopher Mickus, Neal, Gerber & Eisenberg, LLP, Chicago, IL, for Plaintiff, Stuart Y. Silverstein.

Richard Dannay, Thomas Kjellberg, Cowan, Liebowitz & Latman, PC, New York, NY, for Defendant, Penguin Putnam, Inc.

### Findings of Fact and Conclusions of Law

JOHN F. KEENAN, District Judge.

### Background

This case revolves around the poems of Dorothy Parker, the famous writer who was a member of the Algonquin Round Table. Ms. Parker published her literary works mainly during the first half of the 20th century. She authored poems, verses, dramatic reviews, short stories, plays, and screen plays.[1] Her works appeared in various periodicals, including: *The New York Tribune, Vanity Fair, Vogue, The New Yorker, New York World, The New York Herald Tribune, The Saturday Evening Post,* and *Life.* Over the years, Ms. Parker collected her poems in several books: *Enough Rope* (1926), *Sunset Gun* (1928), *Death and Taxes* (1931), *Not So Deep as a Well* (1936), and *The Portable Dorothy Parker* (1944).

At issue in this case is whether plaintiff Stuart Y. Silverstein's compilation of Dorothy Parker's previously uncollected poems in *Not Much Fun: The Lost Poems of Dorothy Parker* (Scribner 1996) ("*Not Much Fun*") is entitled to copyright protection and, if so, whether the defendant

---

1. Parker also wrote under the pseudonyms Henriette Rousseau, Helen Wells, Constant Reader, or D.P. She also published items under her maiden name, Dorothy Rothschild.

Putnam Penguin Inc.'s book *Dorothy Parker: Complete Poems* (Penguin Books 1999) (*"Complete Poems"*) infringed upon that copyright. Silverstein also raises claims of "reverse passing off" under the Lanham Act and unfair competition and immoral trade practices under New York state law.

On April 4, 2003, this Court entered summary judgment for the plaintiff and enjoined the defendant from selling or further distributing *Complete Poems*. On appeal, the Court of Appeals for the Second Circuit vacated the judgment and the injunction and remanded the case for trial. *Silverstein v. Penguin Putnam, Inc.*, 368 F.3d 77 (2d Cir.2004).

The Court of Appeals held that issues of material fact existed as to whether Silverstein exercised sufficient creativity in the selection of poems for *Not Much Fun* for copyright protection to attach. *Id.* at 78–79, 83. In particular, the Court of Appeals ruled that trial was required to determine if Silverstein exercised any creativity at all in his selection process or if he merely included as many of Parker's uncollected poems as he could find. *Id.* at 79.

This case was tried without a jury from July 17, 2007 through July 25, 2007. The Court heard the testimony of seven live witnesses: the plaintiff Stuart Y. Silverstein; Jane von Mehren, a former employee of defendant Putnam Penguin, Inc. ("Penguin"); Gillian Blake, a former employee of Scribner, who was the editor assigned to work on *Not Much Fun*; Michael Millman, a former Penguin employee; David Shanks, the Chief Executive Officer of Penguin; John Makison, the director of Penguin's parent company and the Chairman and Chief Executive of the Penguin Group; and Kathryn Court, president and publisher of Penguin Books, a division of Penguin Group USA. The Court also viewed and heard the video depositions of Colleen Breese, who edited *Com-*

*plete Poems* for Penguin and Professor Randall C. Calhoun, assistant professor of English at Ball State University in Indiana, Dorothy Parker scholar and the author of *Dorothy Parker: A Bio–Bibliography*. Calhoun also participated in this case by providing two affidavits dated February 1, 2005 and July 14, 2005, respectively.

## I. Findings of Fact

Silverstein included in *Not Much Fun* every work that he decided was (1) a poem or verse (2) authored by Parker (3) that had not been previously published within a collection. The primary question presented is whether these decisions entailed any creativity at all and, if so, whether the amount of creativity suffices for copyright protection to attach.

The Court finds that Silverstein simply selected for inclusion in *Not Much Fun* all of the uncollected Parker poems that he could find and that this selection process involved no creativity. His decision that certain works were poems was based objectively on whether the work contained the conventional structural features of a poem. This finding is evidenced by the fact that every poem in *Not Much Fun* is objectively recognizable as a poem and that Silverstein did not exclude any uncollected Parker poems from the book. It is further supported by the fact that Silverstein represented *Not Much Fun* as, and the book itself purports to be, a compilation of all of Parker's uncollected poems. Furthermore, Silverstein's decision that certain works were or were not authored by Parker was based on historical evidence and not creative judgment.

### A. *Silverstein's Compilation of Dorothy Parker's Poems*

Some time in early 1994, while looking through an old issue of *Life Magazine*, Silverstein came upon some Dorothy Par-

ker poems that he recognized had not been previously collected. After searching through more issues of *Life* and discovering more previously uncollected Parker poems, he came up with the idea of putting together a book of Parker's previously uncollected poems. (Tr. 30.)[2] The book would ultimately be titled *Not Much Fun: The Lost Poems of Dorothy Parker* (*"Not Much Fun"*) and contain 121 of Parker's previously uncollected poems.[3]

In creating *Not Much Fun,* Silverstein's "goal was to compile as complete a list of items that [he] determined to be poems written by Dorothy Parker." (Tr. 34.) To achieve his goal of completeness, Silverstein went through the various periodicals in which Parker's works had originally appeared, page by page and issue by issue. He went to every library he thought would possibly have something—about twelve libraries in total. He went through originals or microfilm versions of the periodicals, whichever was available to him at a particular library. (Tr. 34–35.) He spent approximately two years searching for uncollected Dorothy Parker poems and verses to include in *Not Much Fun.* (Tr. 38.)

In 1993, before Silverstein began compiling Parker's uncollected poems, Professor Randall C. Calhoun published *Dorothy Parker: A Bio–Bibliography* (Greenwood Press 1993) (*"Bio–Bibliography"*.) Calhoun's *Bio–Bibliography* lists both the collected and uncollected works of Dorothy Parker. In preparing *Bio–Bibliography,* Calhoun read biographies of Parker and collected all of the Parker works that he could find, gathering unpublished ones from old newspapers and magazines. (Calhoun Dep. Tr. 20–21.)[4] After gathering Parker's works, Calhoun listed their titles and publication information in *Bio–Bibliography* under one of six categories: books, short stories, screenplays, published interviews, miscellaneous work, and individual pieces from magazines and newspapers. (Calhoun Dep. Tr. 34–37.) Within this last category, each of the particular magazines and newspapers that published Parker's works has its own subheading, under which the individual Parker works are classified as, for example, long articles, poetry, prose, and book reviews. (PX 8.)[5] Calhoun believes *Bio–Bibliography* is the "most exhaustive catalogue of works by and about Dorothy Parker ever compiled." (Calhoun Dep. Tr. 52.)

Although Calhoun's *Bio–Bibliography* lists the titles and publication information to virtually all of the poems ultimately compiled by Silverstein in *Not Much Fun,* Silverstein was unaware of Calhoun's book until late 1994 or early 1995. (Tr. 32.) As a result, Silverstein had to discover most of Parker's uncollected poems on his own. By the time Silverstein discovered *Bio–Bibliography,* he had already located all but one of the poems listed in that book and was "appalled" that he had missed that poem. (Tr. 37.)

Silverstein's selection process consisted of three steps. When Silverstein located an item, he would first "determine whether or not [he] considered it to be a poem or a verse." (Tr. 38.) If Silverstein determined that a work was a poem or a verse, he would next determine whether it was written by Dorothy Parker. Finally, he would determine whether the poem or verse had been collected previously, (Tr.

---

**2.** "Tr." refers to pages of the trial transcript.

**3.** The book also contains the poem "Day Dreams," which had been collected in Parker's first compilation *Enough Rope* in 1926 and was included in *Not Much Fun* by mistake.

**4.** "Calhoun Dep. Tr." refers to the transcript of Professor Calhoun's deposition, which took place on February 26, 2007.

**5.** "PX" refers to Plaintiff's exhibit.

42.) Silverstein included every work that he determined to be a poem or verse written by Parker that had not previously been published in a collection. He claims that the first two steps—determining that a work was a poem or verse and attributing it to Parker—entailed creative decision making that confers copyright protection to *Not Much Fun.*

### 1. Step One: Poem or Verse?

The Court finds that Silverstein sought to compile every uncollected Dorothy Parker poem he could find. Accordingly, he employed a broad, structural definition of "poem" in determining whether an individual work was a poem or not. This determination did not entail creativity.

The Court heard testimony regarding the conventional definition of "poem" under which Silverstein operated. Poems are typically published in lines and stanzas, often indented from the margins and set off from any surrounding text. (Calhoun Dep. Tr. 92–93.) A poem sometimes possesses rhyme and meter, though this is not necessary.[6] (Calhoun Dep. Tr. 118–19.) The Court also observes that a poem is typically free from the usual rules of grammar, punctuation, and capitalization. In contrast to a "poem," "prose" runs from margin to margin and is organized in paragraphs and sentences. The first line of each paragraph is indented, and sentences continue and run seamlessly from line to line. Prose follows the rules of grammar, punctuation, and capitalization.

Determining that a writing meets the structural criteria of a poem is a fairly obvious decision, one differing substantially from the question of whether a work is poetic or poetry. (Calhoun Dep. Tr. 87–88.) A work can be written in the form of a poem, yet knowledgeable people may disagree over whether it is poetry or not. In other words, poetry consist of poems, but not all poems are poetry. Professor Calhoun testified that "the definition of poetry is general and vague and that whether an item should be deemed to constitute poetry is a personal, subjective determination that is informed by and depends upon an individual's personal background, education, taste and judgment." (Calhoun Dep. Tr. 52–53.) In contrast, one seeking to compile all of an author's poems might identify a poem by using the working definition: "if it goes from margin to margin, it's prose; if it's indented and set off, it's a poem," or if it's published "in lines and stanzas, set off from surrounding text," it is a poem. (Calhoun Dep. Tr. 92, 94–95.) The Court finds that Silverstein used an objective definition of "poem" such as this to identify poems for inclusion in *Not Much Fun.*

At trial, Silverstein stated that his "definition of a poem after doing some research was pretty much that it had some kind of rhyme, it had some kind of meter maybe, but maybe not." (Tr. 40.) After identifying these obvious features, which Silverstein characterized as "general guidelines [that] were not carved in stone," Silverstein could only describe in the vaguest of terms what was unique about his own definition of a poem. When asked how he identified poems for *Not Much Fun,* Silverstein responded "I wish I could say that I went through this hard-and-fast process, what I did, like I had a checklist or something. Basically I had a general idea what a poem was based on what I told you before [regarding rhyme and meter]. I

---

**6.** As Calhoun testified, before World War Two, a poem almost always had rhyme and meter. Poems were typically four beats per line in an "A, B, A, B" rhyme scheme. Since that time, the popular definition of poem has become more lenient and rhyme and meter are no longer required to make something a poem. (Tr. 118–19.)

would make a snap judgment, do I think this is a poem or not." (Tr. 41.)

Silverstein could not articulate, and the Court cannot discern, any creative principle that guided his determination that a work was a poem or not. Silverstein repeatedly characterized his inclusion of specific poems as "instances of subjective selection," merely parroting the legal standard that he had to prove. (Tr. 194–98.) His overuse of the word "subjective" seemed consciously tailored to the relevant case law for the purpose of winning this lawsuit. In reality, Silverstein classified as poems those Parker works that fit the typical structure of a poem, described above, just as anyone else would. This selection process involved no creativity.

The conventional definition of a "poem" employed by Silverstein encompasses free verse. The testimony and evidence presented at trial showed that free verse contains the same structure and format as that of a poem, except that free verse is rarely written with rhyme or meter. (Tr. 42–43.) Calhoun testified that free verse is simply prose reformatted to look structurally like a poem. As an extreme example, an article in the New York Times could be considered free verse if it is reformatted into lines and stanzas and set off from the surrounding text. (Calhoun Dep. Tr. 90.) An anthologist striving for completeness would include free verse in a collection of poems. (Calhoun Dep. Tr. 90–92.)

Silverstein testified that he initially wanted to include just, strictly speaking, Parker's poems, but he later decided to include free verses because he "just thought it would be nice to put them in." (Tr. 34.) In truth, he did not really distinguish much between poems and free vers-es. The subtitle to *Not Much Fun* is "The Lost Poems of Dorothy Parker." (PX 2.) The book does contain separate sections for "The Poems" and "The Hate Verses," the latter being a group of eighteen free verses that Parker published in issues of *Vanity Fair* and *Life* magazines between 1916 and 1924.[7] Yet the distinction between poems and free verse is blurred by Silverstein's inclusion of an item that he categorizes as a free verse within the "Poems" section of the book. (Tr. 97; PX 2 at p. 76.) The Court finds that Silverstein's emphasis at trial on the distinction between poems and free verses is an attempt to make his book appear more eclectic than what it really is-a compilation of all of Parker's uncollected poems.

#### a. Items Included in *Not Much Fun*

The fact that each of the works compiled in *Not Much Fun* (including the free verses) is objectively recognizable as a poem supports the conclusion that Silverstein's selection decisions were based not on subjective "snap judgments" but on purely objective factors. Silverstein cites his identification of several works as poems— "Letter to Robert Benchley," "Letter to Ogden Nash," "After Dawn," "Chris–Cross," "When We Were Very Sore," and "Excursion into Assonance"—as examples of subjective judgment. The Court's review of these works reveals that they are quite obviously poems and that their identification as such entails no creative judgment.

Silverstein determined that a letter Dorothy Parker wrote to Robert Benchley in 1920 was a poem, therefore he included it in *Not Much Fun* under the title: "Letter to Robert Benchley." (PX 2 at p. 78.) He

---

7. Silverstein's organization of works within *Not Much Fun* into sections of "Poems" and "Hate Verses" may evidence a creative arrangement, but arrangement is no longer in the case. *Silverstein,* 368 F.3d at 84 (ruling that *"Complete Poems* does not appropriate Silverstein's arrangement").

decided to include the letter because "[i]t was written in rhyme and it was goofy." (Tr. 44) A photocopy of the letter reveals that it consists of a single stanza of thirty rhyming couplets that are written with metered lines. The following is a representative extract from the letter in its original format:

Greetings to all from the pine-scented woods!

We hope everybody is feeling so good.

Kindly forgive our writing in pencil;

It's too much trouble to get the other utensil.

(PX 1.) As is shown, where a line does not fit within the margins, it is indented below and kept apart from the next line in order to preserve the rhyme scheme. The Court finds that the Letter to Robert Benchley is objectively recognizable as a poem.

There is no scholarly debate over whether the "Letter to Robert Benchley" is a poem. At trial Silverstein asserted that, in her biography of Dorothy Parker entitled *Dorothy–Parker: What Fresh Hell Is This?*, Marion Meade calls the "Letter to Robert Benchley" a letter and does not affirmatively call it a poem. On cross-examination, Silverstein admitted that Meade in fact classifies the letter as a poem in the book's index. (Tr. 210.) Professor Calhoun testified about "Letter to Robert Benchley," which he did not list in *Bio–Bibliography*. Calhoun does not remember if he was aware of the letter at the time he wrote his book. (Calhoun Dep. Tr. 162–64.) He testified that the letter is a poem and that he would include it in an collection of all of Parker poems. (Calhoun Dep. Tr. 164.)

Silverstein also determined that a letter from Dorothy Parker to Ogden Nash, included in a 1931 advertisement for a new Ogden Nash book, was a poem. According to Silverstein, the letter is "kind of in rhyme," "but it really isn't a poem, but [he] decided it was a poem anyway because [he] wanted to put it in." (Tr. 57.) Silverstein described the letter as "a rhyming verse." (Tr. 58.) He included the letter in *Not Much Fun* under the title "Letter to Ogden Nash." (PX 2 at p. 180.) Like the "Letter to Robert Benchley," this letter is written in metered lines and consists of one stanza of couplets that rhyme or nearly rhyme. It is also structured so that, where one line does not fit within the margins, it is indented below and kept apart from the next line to preserve the rhyme scheme, as the following excerpt demonstrates:

Dear Sir, I trust you will pardon this intrusion of an Old Subscriber

Who used to dabble for a living in rhyme, as well as verse libre.

But has now Got Away From It All, owing to a plethura [sic] of intellectuals,

Racquet Club members, players on two pianos, raconteurs, and homosectuals [sic].

(PX 1.) The January 1931 issue of Readers Guide to Periodical Literature classified this letter as a poem. (Tr. 206–07.) Silverstein's determination that the "Letter to Ogden Nash" is a poem is an obvious one requiring no subjective or creative judgment.

Silverstein selected two writings in book reviews written by Constant Reader, a well-known Dorothy Parker pseudonym, to include as poems in *Not Much Fun*. One poem appears in a *New Yorker* book review from November 17, 1927. (PX 1.) Silverstein titled the poem "Chris–Cross" because "the tenor of the book review tends to draw some confusion between Christopher Morley and Christopher Robin." (Tr. 49.) Silverstein did not explain how he determined that a specific portion of the book review was a poem, but the reason for the selection is obvious to any reader: The poem is set apart from the

text of the review by space above and below and is printed in smaller font than the remainder of the text. The poem follows an "a-b-a-b" rhyme scheme and reads as follows:

Christopher Morley goes hippetty hoppetty.

Hippetty, hippetty, hop.

Whenever I ask him politely to stop it, he

Says he can't possibly stop . . .

(PX 1, 15.) The remainder of the book review is written in standard prose.

Silverstein also extracted a poem from a May 30, 1931 Constant Reader book review. (PX 1.) The book review discussed a book called *Dawn*, and the poem follows the review, so Silverstein titled the poem "After Dawn." He decided to include it in *Not Much Fun* on "somewhat of a whim," "because there is technically a rhyme," and because he "tend[s] to agree with [Parker's] philosophical literary stance about Theodore Dreiser." (Tr. 50.) On inspection, Silverstein's decision to include "After Dawn" looks less like a whim and more like simple adherence to the structural, popular definition of poem. The two-line poem follows the book review and is set apart from the other text by space above the poem. The lines rhyme and, unlike the rest of the text, are indented from the margins. In contrast, the rest of the review is written in standard prose. (PX 1.) The Court finds that Silverstein did not exercise creative, subjective judgment in deciding to include "Chris–Cross" or "After Dawn" in *Not Much Fun.*[8]

Nor is there any scholarly debate about whether "Chris–Cross" or "After Dawn" are written in the form of a poem. Calhoun classified the book reviews within which "After Dawn" and "Chris–Cross"

are embedded as "book reviews" in *Bio–Bibliography.* He recognized that each book review also contains a poem. Calhoun did not include the embedded poems in the "poem" section of *Bio–Bibliography* because he did not double count items. (Calhoun Dep. Tr. 156.) He stated that the poem contained in each book review is objectively recognizable as a poem, (Calhoun Dep. Tr. 156), though he does not consider either to be a very good poem. (Calhoun Dep. Tr. 54–56, 116–17.) Calhoun stated that "literature is replete with examples of poems embedded in works such as plays, novels, stories and essays. A poem is no less a poem if it is published embedded in a larger work of another type." (Calhoun Dep. Tr. 153.) Calhoun believes that it would be improper to omit "Chris–Cross" and "After Dawn" from a collection of all of Parker poems. (Calhoun Dep. Tr. 156–57.)

Silverstein also selected the poem, "When We Were Very–Sore," from the *New York World* for inclusion in *Not Much Fun.* The poem is set apart from the remaining text on the page by space above and below and is indented from the margins. The font of the poem is larger than the other text on the page. The poem contains some rhyme but lacks meter. If a man on the street were asked to glance at the page of the *New York World,* on which "When We Were Very Sore" appears, he would almost certainly identify as a poem the same lines that Silverstein selected. Whether that person would deem the poem to be good or bad is another question. "When We Were Very Sore" reads, as follows:

Dotty had

Great Big

Visions of

---

8. Silverstein exercised creativity in coming up with the titles "After Dawn" and "Chris–Cross," but the Second Circuit ruled that Silverstein is estopped from asserting copyright protection on this ground. *Silverstein,* 368 F.3d at 83.

Quietude
Dotty saw an
Ad. and it
Left her
Flat.
Dotty had a
Great Big
Snifter of
Cyanide.
And that (said Dotty)
Is that.

(PX 62.)

Silverstein selected another work from the *New York World* titled "Excursion Into Assonance." This item is indented from the margins and is set apart from the rest of the text on the page. It contains meter and a kind of slant rhyme known as "assonance," an oft-employed technique in poetry. "Excursion Into Assonance" reads in part:

I have trodden level sand
    Along a reach of gray—
From dune-top to sea's end.
    No breathing thing but me.

(PX 63.) Silverstein decided that "Excursion Into Assonance" is a poem because it is objectively recognizable as a poem. This conclusion entailed no creativity.

As discussed above, Silverstein included in *Not Much Fun* eighteen items referred to collectively as the "Hate Verses." (PX 20–37.) He included the "Hate Verses" in *Not Much Fun* because "[t]hey fit [his] standard definition of free verse. It's essentially prose that's been reformatted." (Tr. 96.) As one can see from the following excerpt of "Women: A Hate Song," which is representative of the other "Hate Verses," there is no rhyme or meter, but the overall format and structure meet the broad definition of poem:

I HATE Women;
They get on my Nerves.
There are the Domestic ones.
They are the worst.

Every moment is packed with Happiness.

They breathe deeply

And walk with large strides, eternally hurrying home

To see about dinner.

(PX 20.) Calhoun, finding the "Hate Verses" to be objectively recognizable as poems, classified them as poems in *Bio-Bibliography*. Silverstein's decision to include the "Hate Verses" in a complete anthology of Parker's poems entailed no creativity.

Silverstein also included in *Not Much Fun* an item called "Oh, Look–I Can Do It, Too: Showing That Anyone Can Write Modernist Verse" ("Oh Look"). (PX 2 at p. 76.) Silverstein included "Oh Look" because he categorized it as a free verse. (Tr. 97.) When asked how he determined it was free verse, Silverstein responded, "[b]ecause it essentially looks like prose that has been reformatted. I mean it also has a little bit of an artistic quality to it, but, you know, it's a free verse." (Tr. 97.) Indeed, a look at an excerpt from the actual writing easily confirms that "Oh Look" looks like prose reformatted into a poem. The formal prose rules of sentence structure and capitalization are completely disregarded:

A litter of newspapers

Piled in smothering profusion.

Supplements sprawling shamelessly open,

Flaunting their lurid contents—

"Divorced Seven Times, Will Re–Wed First Wife,"

Unopened sheets of help advertisements;

Editorials, crumpled in a frenzy of ennui;

Society pages, black with lying photographs.

(PX 1.)

As is clear from the foregoing examples, the poems selected by Silverstein are objectively recognizable as poems. No creative or subjective judgment inhered in their classification as such.

### b. Items Excluded From Not Much Fun

The fact that Silverstein did not exclude any uncollected Parker poems that he found also shows that he sought to compile all and not merely a selection of them. Silverstein claims that his exclusion of a set of four items called "Figures in American Folk Lore," an item titled "Playing Safe," and a set of six song lyrics collectively titled "Standardized Song Sheet for Get Together Meetings" reflects his subjective selection. The Court finds that these works do not meet the basic structural criteria of a poem, so that the decision to exclude them from a collection of poems is natural and obvious.

Silverstein originally considered for inclusion in *Not Much Fun* four pieces called "Figures in American Folk Lore." (PX 40–43.) He included these in his original manuscript in 1994, but he later deselected them before publication because, in his mind, they were neither poems nor free verses. (Tr. 198–199.) Silverstein does not explain how he made this decision, but the pieces speak for themselves. Their format is not consistent with the popular definition of poem and they look more objectively like prose. Each piece contains sentences organized into paragraphs, though some of the paragraphs are only a sentence or two long. The first sentence of each paragraph is indented. The sentences run seamlessly from line to line. Standard capitalization and punctuation are used. The pieces do not contain any rhyme or obvious meter. A short

excerpt from "Figures in American Folklore: The Actress," follows:

She is always at least twice as old as she looks on stage.

She is able to play emotional roles only after she has suffered.

She takes personally all the tribulations of the heroine that she is impersonating. At the end of the big scene, she is a total wreck.

(PX 41.) The Court finds that Silverstein's decision to exclude "Figures in American Folklore" from his compilation of poems because they are in fact not poems was not subjective or creative.

Silverstein also excluded a work titled "Playing Safe" from *Not Much Fun* because he determined that it was "a piece of prose and rather rotten prose at that." (Tr. 86.) Indeed, it does not share any of the typical features of a poem. It consists of sentences that run from line to line that are organized into paragraphs, not stanzas, with the first sentence of each paragraph indented. It contains no rhyme, assonance or obvious meter. A short excerpt from "Playing Safe" demonstrates its obvious prose-like qualities:

Why, we would love to come see you but it's pretty hard to make a definite date right now—Arthur's so busy downtown. I tell you what I'll do, I'll call you up some time soon, and let you know. Oh, don't bother to write down the number—I'll remember it.

(PX 38.) Calhoun categorized this work as a poem in *Bio–Bibliography*. He testified at his deposition that this classification was a mistake. (Calhoun Dep. Tr. 110.) "Playing Safe" is not a poem, but rather is a prose squib. If he had the chance to issue a new edition of *Bio–Bibliography* he would change the classification of "Paying Safe" and would no longer classify it as a poem. (Calhoun Dep. Tr. 110, 173.) The Court agrees. Silverstein did not exercise

creative or subjective judgment in deciding to exclude "Playing Safe" from *Not Much Fun* because it is obviously not a poem.

Silverstein excluded "Standardized Song Sheet For Get Together Meetings" ("Song Sheet") from *Not Much Fun* because, although it does contain rhyme and meter, he determined it was not a poem, but was instead a "second rate parod[y] of song lyrics." (Tr. 90.) This is not a surprising determination, given that the item is titled "Standardized Song Sheet" and even contains a chorus. (PX 44–49.) Some of Parker's other poems contain the word "song" in their titles, but none other contains a chorus or is a parody of existing song lyrics. Though Calhoun listed "Song Sheet" as a poem in *Bio–Bibliography,* he testified that it is "somewhat anomalous" and he would not disagree with an anthologist who decided to omit "Song Sheet" from a collection of Parker poems. (Calhoun Dep. Tr. 121.) Silverstein may have exercised a negligible amount of subjectivity in deciding that these song lyrics were not poems.

Silverstein included an item titled "Higgledy Piggledy" in the Introduction to *Not Much Fun,* (PX 2 at p. 43 n. 77), but did not reprint it as a poem in the book. "Higgledy Piggledy" was a work Parker created at a dinner party when, according to Silverstein's introduction, another dinner guest, Somerset Maugham "challenged her to write him a poem on the spot." "Higgledy Piggledy" reads as follows:

Higgledy Piggledy, my white hen;

she lays eggs for gentlemen.

You cannot persuade her with gun or lariat

to come across for the proletariat.

(PX 39.) Silverstein claims that he did not consider "Higgledy Piggledy" to be a poem at the time he compiled *Not Much Fun.* At trial, he testified that although "[i]t rhymed, it had meter and all those other elements" characteristic of a poem, he "just didn't think it was a poem." Instead, Silverstein considered it "a cute little wisecrack" and chose not to include it in *Not Much Fun.* However, he testified that, in retrospect, he "probably would have collected it for a poem." (Tr. 93.) Calhoun confirms that "Higgledy Piggledy" is a poem, (Calhoun Dep. Tr. 59), and listed it in *Bio–Bibliography* under the category of "miscellaneous work," which includes "incidental essays, poems, and critical prose." (PX 8 at p. 63.) The Court cannot conclude that Silverstein's mistake in failing to identify "Higgledy Piggledy" as a poem was an exercise of creative judgment.

## 2. *Step Two: Written By Dorothy Parker?*

Silverstein excluded from *Not Much Fun* three poems that he determined were not written by Dorothy Parker. He averred at trial that determining authorship was a highly subjective process and that "there were no objective criteria upon which to base my subjective selection" of which poems to attribute to Parker. (Tr. 198.) The Court disagrees. Silverstein's decisions that these three poems were not written by Dorothy Parker were based on historical facts and evidence.

The first poem, "From the Ladies," Silverstein determined was not written by Parker because "he had no proof whatsoever" and because it was signed "Squidge." (Tr. 78.) Silverstein did not think that Parker used Squidge as pseudonym because she never collected any poems written by Squidge in any of her own collections. (Tr. 78.) Only one published source has ever attributed "From the Ladies" to Dorothy Parker. (Tr. 81.) Based on historical evidence, or lack thereof, Silverstein determined that "From the Ladies" was not written by Parker and excluded it from *Not Much Fun.* This was not a creative, subjective decision.

The second poem, "Upon My Honor" (or "Madonna"), Silverstein concluded was not written by Parker because Parker herself denied writing it in her lifetime. Silverstein testified that an article in *Esquire* magazine written by Wyatt Cooper reported that Parker disclaimed authorship of this poem. (Tr. 200.) In fact, Parker was apparently "livid" that anyone would think that she would rhyme "upon my honor" with "Madonna." (Tr. 200.) Silverstein noted that the article also stated that Parker was known to lie, and that some people believe that Parker did in fact author the poem. Although Silverstein maintains that his decision that Parker is not the author was creative, (Tr. 201), the Court finds that he simply weighed the available historical evidence and that this was not a creative decision.

Silverstein also determined that Parker did not author a poem about Elinor Glynn, a 1920s writer. (PX 97.) Silverstein learned of this poem when an attorney for the NAACP, which owns the rights to many of Parker's poems, contacted him to find out if there was any authority that Parker had written it. (Tr. 80.) Silverstein did not believe Parker to be the author because there was no "categorical documentary evidence" linking her to the poem. (Tr. 83.) Also, Silverstein was aware that Parker had written a review of a book by Elinor Glynn. Had Parker also authored the poem about Glynn, Silverstein would have expected Parker to include it in the book review.(Tr. 84.) Due to a lack of historical evidence that Parker wrote the poem, he decided to exclude it. (Tr. 79–80, 84.) This, also, was not a creative decision.

### 3. Step Three: Previously Uncollected?

Step three warrants little discussion. Determining whether an item was previously collected entailed simply checking previous collections to see whether the works appeared in them. Silverstein admits that determining whether an item was or was not previously collected was not a creative process. (Tr. 42.)

### 4. Selection Process Overview

Silverstein was not exercising creativity in his decisions to include or exclude items from *Not Much Fun.* No creativity was involved in his selection process because he identified works as poems simply by their structural characteristics and attributed poems to Parker based on historical evidence. Silverstein was asked repeatedly at trial to name one single item which he determined to be a poem or verse written by Dorothy Parker and previously uncollected that he decided to exclude from *Not Much Fun,* but he could name none:

Q. Mr. Silverstein, can you name all the works that you determined to be poems or verses by Dorothy Parker that you left out ... [of] Not Much Fun?

A. There were none.

(Tr. 234.) In sum, Silverstein sought to compile all of the uncollected Dorothy Parker poems he could find. As a result, *Not Much Fun* cannot be viewed as a creative selection of her poems.

### B. Calhoun's Opinion of Not Much Fun

On appeal, the Second Circuit identified Professor Calhoun as a "foremost Parker scholar" whose knowledge and opinion could be helpful in resolving some of the case's factual issues. *Silverstein,* 368 F.3d at 80–81. Based on his assessment of *Not Much Fun,* Calhoun considers the book to be an anthology of all of Parker's uncollected poems. As a scholar who has spent a considerable amount of time researching Parkers' works, Calhoun does not know of any uncollected poems that Silverstein failed to include in *Not Much Fun* other than "Song Sheet," which he admits is an

anomalous item, and "Upon My Honor," which Silverstein omitted due to attribution issues. Calhoun testified that all of the poems compiled in Not Much Fun were originally published in a way that makes them objectively recognizable as poems under a broad definition of poem. He also testified that every poem contained in Not Much Fun belongs in a complete collection of Parker's poems.

In arguing his case before the Second Circuit, Silverstein attempted to use Calhoun's classification of Parker's works in his book, Bio–Bibliography, to stage a scholarly debate over whether certain Parker items are poems. See Silverstein v. Penguin Putnam, Inc., 368 F.3d 77, 80–82 (2d Cir.2004). Besides "Letter to Robert Benchley," "After Dawn" and "Chris–Cross," which are discussed above, there are only three items included in Not Much Fun that are not classified as poems in Calhoun's Bio–Bibliography. These three items are "Men I'm Not Married To," "Monody" and "The Passionate Screenwriter to His Love." See id. at 81 n. 3. As discussed below, Calhoun testified that all of these items are poems and his failure to classify them as such in his book does not stem from any scholarly debate about whether they are in fact poems.

Calhoun classified the book "Men I'm Not Married To" as a book, even though a poem bearing the same title is embedded within the book. Calhoun did not classify the item separately as a poem because he did not double count items. (Calhoun Dep. Tr. 166–67.) Calhoun testified that "Men I'm Not Married To" is objectively recognizable as a poem, and should naturally be included in a complete anthology of Parker poems. (Calhoun Dep. Tr. 167–68,)

Calhoun also agreed that "Monody" and "The Passionate Screenwriter to His Love" are poems that he would include in a complete anthology of Parker's poems. (Calhoun Dep. Tr. 161–62, 164–65.) Cal-

houn explained that he omitted "The Passionate Screenwriter to His Love" from Bio–Bibliography because he had not seen sufficient evidence to conclude that Parker was its author. (Dep. Tr. 161–62.) Calhoun did not state why he omitted "Monody." However, his testimony shows that there is clearly no academic dispute between him and Silverstein about whether any of the six items missing from Bio–Bibliography's list are in fact poems. (Calhoun Dep. Tr. 167–68.)

Silverstein's counsel spent a considerable amount of time trying to impeach Calhoun by questioning him about differences between his February 2005 and July 2005 Affidavits. The Court has already ruled that there is no genuine conflict between the two affidavits. See Silverstein v. Penguin Putnam, Inc., No. 01 Civ. 309 (S.D.N.Y. June 26, 2006). Silverstein's questions at Calhoun's deposition were aimed, fruitlessly, at uncovering some illicit deal between Calhoun and Penguin in which Penguin induced Calhoun to change his mind on certain issues that would adversely affect Silverstein's case. The Court finds that this allegation is utterly baseless. Calhoun's deposition testimony made clear that any inconsistencies between the two affidavits were the result of Calhoun rethinking his earlier statements, changing his mind on certain subjects, or using imprecise language in one document or the other. No evidence remotely suggests that any of Calhoun's statements were disingenuous or that Penguin or its counsel attempted to wrongfully sway his testimony.

## C. *Silverstein Prepares a Manuscript*

After completing his search for all of Dorothy Parker's uncollected poems and verses, Silverstein created a manuscript for Not Much Fun. (PX 79.) He wrote an introduction and typed each Parker poem

or verse into his computer. He assigned titles to works that did not already have titles, including "Chris–Cross," "After Dawn," and "Letter to Robert Benchley." He also made edits to some works.[9] (Tr. 113–14.)

Silverstein sought and obtained non-exclusive licenses and permissions from every holder of a copyright to the Parker poems that were not in the public domain. Those copyright holders included the NAACP, *The Saturday Evening Post,* and the Boston University Mulgar Library. (PX 83, 84, 85, 86, 88, 89, 90, 91, 92; Tr. 107–10.)

While obtaining these licenses, Silverstein represented *Not Much Fun* as a collection of all of Parker's uncollected poems. Silverstein's agreement with the NAACP called for him to provide the NAACP with "a complete list of Dorothy Parker's poems, indicating the owner of each poem." (PX 88; Tr. 257.) In a March 25, 1996 letter from Silverstein to Ned Himmelrich, the attorney for the NAACP, Silverstein enclosed that complete list. The letter stated that the "lists contain exhaustive publication and copyright information" for Parker's poems and were as accurate as Silverstein could provide. (PX 99.)

This complete list does not name a single uncollected poem that Silverstein excluded from *Not Much Fun.* (DX X.)[10] The unmistakable impression is that Silverstein sought to compile all uncollected Parker poems that he knew to exist. Nowhere does Silverstein imply to the NAACP that he was listing only the poems that he liked, or only those poems meeting his special subjective definition of "poem." At trial, Silverstein testified that his copyright notice, displayed at the top of the list, communicated to the NAACP that the list did not catalogue all of Parker's poems. Silverstein reasoned that the copyright notice "indicated original work which would indicate subjectivity." (Tr. 262.) In truth, Silverstein's description of the list as "complete" and "exhaustive" would have prevented anyone from understanding it to contain merely a selection of Parker's poems.

### D. *Silverstein Submits The Not Much Fun Manuscript to Penguin*

After meeting Jane von Mehren, then a senior editor at Penguin, at a convention in Los Angeles, Silverstein mailed Ms. von Mehren the *Not Much Fun* manuscript. (Tr. 118.) The manuscript contained a copyright notice on the bottom of each page that stated "Compilation ©1994 S.Y. Silverstein." (PX 79.) The manuscript sent to Penguin also included a prologue, written by Silverstein, that was "essentially a pitch designed to interest Penguin in the book." (Tr. 115–16.)

At an editorial meeting in 1994, von Mehren discussed the possibility of publishing *Not Much Fun.* (Tr. 323, 593.) Kathryn Court, who was editor-in-chief at Penguin at that time, and Michael Millman, then a senior editor, were present at this meeting. The general consensus of the meeting and subsequent conversations was that it would make more sense to publish the poems in *Not Much Fun* as part of a larger collection. (Tr. 327, 594.) Mr. Millman testified that compilations of an author's complete works are very common and that completeness has a value in and of itself. (Tr. 517.) At the time Penguin considered the *Not Much Fun* manuscript, there was already talk at Penguin

---

**9.** The Second Circuit ruled that Silverstein is estopped from asserting copyright protection on the basis of his edits. *Silverstein,* 368 F.3d at 83.

**10.** "DX" refers to Defense exhibit.

of publishing a complete collection of Parker poems. (Tr. 517.) Penguin had just published *Dorothy Parker: Complete Stories.* and some at Penguin thought that a complete poems volume would be an appropriate companion volume. (Tr. 517.)

Ms. von Mehren sent Silverstein a letter, dated August 4, 1994, in which she expressed Penguin's inclination to place the poems in *Not Much Fun* in a complete volume or larger selection rather than as a stand-alone book. (PX 80.) In October 1994, Ms. von Mehren wrote a letter to Silverstein's agent, Peter Lampack, reiterating its intent to publish the poems in *Not Much Fun* in a complete or selected volume of Parker poems, and offering Silverstein $2,000 to assemble the materials for the complete volume. (PX 82.) Through his agent, Silverstein declined the offer. (Tr. 125–26.)

Silverstein then submitted the *Not Much Fun* manuscript to Simon and Schuster's Scribner for publication.

### E. *Scribner Publishes Not Much Fun*

In August 1996, Scribner published *Not Much Fun: The Lost Poems of Dorothy Parker* in hardcover, edited and with an introduction by Stuart Y. Silverstein. (PX 2.) The book contains the 122 works from Silverstein's manuscript and is 256 pages long. The poems are arranged into two sections. The first section contains "The Poems" and the second section includes the group of verses collectively referred to as "The 'Hate Verses.'" Within each section, the poems and verses are arranged in the chronological order of their original publication.

Scribner registered a compilation copyright for *Not Much Fun* with the Copyright Office in Silverstein's name in 1996, as evidenced by Registration Certificate No. TX–4–347–579. (PX 9.) The hard cover edition of *Not Much Fun* contains the following copyright notice: "Copyright ©

1996 by Stuart Y. Silverstein." Scribner published a paperback version of *Not Much Fun* in 2001, leaving the content unchanged and changing only the front and back covers. (PX 3.) The paperback contained the same copyright notice as the hardcover edition. (Tr. 126.) The London publisher Duckworth released a United Kingdom edition of *Not Much Fun* in 1999, and a French publisher, Phebus, published a version of *Not Much Fun* in 2002 or 2003. (Tr. 147.)

The evidence shows that Silverstein promoted *Not Much Fun* as a compilation of all of Parker's previously uncollected poems and verses. In March 1996, Silverstein filled out an author questionnaire for Scribner that he knew was intended to be used in the promotion of the book. (Tr. 242.) In the questionnaire, he wrote "Finally, the collection was as complete as I could make it (though there is always the haunting possibility that I missed some source, somewhere)." (PX 257 ¶ 19.) Scribner's sales handle sheets regarding *Not Much Fun* stated:

> During the early struggling years of her career Dorothy Parker sold more than 250 poems and verses to popular magazines. Although she resurrected some of them in her three volumes of poetry, *Enough Rope, Sunset Gun* and *Death and Taxes* (all out of print), over 100 remained lost for more than half a century. The existence of some of these pieces has been known to scholars, and a few poems have been cited and quoted in earlier works, but this is the first effort to compile the full inventory of Dorothy Parker's uncollected poetry.

(DX Q, R, S.) Silverstein admitted that he supplied the words "full inventory" in promotional materials sent to Tysie Whitman, an employee of Scribner, in July of 1995. (Tr. 246–48; DX P.) In describing his project, Silverstein wrote that "No one ...

has catalogued the full inventory of Mrs. Parker's uncollected poetry and verse, or considered compiling and editing it to form a comprehensive and cohesive whole—until now." (DX P.) In an October 9, 1995 letter to Whitman, Silverstein wrote.

"Please also be aware that the index to the [manuscript] is probably the most comprehensive inventory of Mrs. Parker's poetry and verse yet compiled. The [NAACP] which owns and administers her copyrights has requested an expanded version (with copyright records) to use as its own principal reference."

(DX U.) These statements show that Silverstein proudly represented *Not Much Fun* as compiling all, and not simply a selection, of Parker's uncollected poems.

The book itself purports to be a complete anthology of Parker's poems. The subtitle "The Lost Poems of Dorothy Parker" contains no qualification indicating that the book is merely a selection of her uncollected poems. There is a section at the end of the book titled "The Complete Chronology," which lists poems that were written by Ms. Parker, their original publication date and their subsequent compilation publication date. The "Complete Chronology" section contains an introduction stating that, "This is a chronological list of *all* of Dorothy Parker's poems and verses." (PX 2 at 245 (emphasis in original).) Like the list of poems Silverstein supplied to the NAACP, all of the previously uncollected poems listed in the "Complete Chronology" section are included in *Not Much Fun*.

Prior to publication, in the bound galley of *Not Much Fun,* the "Complete Chronology" section was titled "Sources" and did not contain the introductory language recited above. (Tr. 227–29.) Instead, the "Sources" section stated that "[t]he following is a complete chronological list of Dorothy Parker's poems." (PX 11) The bound galley was sent around to various reviewers for feedback. Some expressed confusion as to why all of the items listed under "Sources" did not appear in *Not Much Fun.* To clarify to readers that the "Sources" section included not only the poems and verses in *Not Much Fun* but also the poems and verses previously collected in other books, the introductory language was added and this section was renamed "Complete Chronology." "All" was italicized to emphasize that the book contained a listing of all of Parker's poems and verses, and not just the ones collected in *Not Much Fun.* (Tr. 140–141.) Gillian Blake, Silverstein's editor at Scribner, corroborated that the introductory language and the word "all" were proposed by Silverstein and were added to address the specific concerns of critics regarding why all of the poems listed in the Complete Chronology did not appear in *Not Much Fun.* (Tr. 381–83.)

Silverstein argued that the import of the introductory language of the "Complete Chronology" depends on what the meaning of "all" is. Silverstein testified that "all" means all of Parker's *collected* poems or all of the compilations of her poems, not all of her poems and verses. (Tr. 139, 143.) If Silverstein genuinely intended to convey that the "Complete Chronology" included only Parker's collected poems, he could simply have inserted the obvious word "collected," or replaced "poems and verses" with "compilations." Instead, the introductory sentence reads "This is a chronological list of *all* of Dorothy Parker's poems and verses." (PX 2 at p. 245.) The plain meaning of this language is that the poems in *Not Much Fun,* combined with the poems collected in Parker's previous compilations, comprises the entire universe of Parker's poems. Silverstein's testimony on cross-examination at trial confirmed this understanding:

Q:  Mr. Silverstein, I want to ask you—and please listen carefully to this question—is there any work that you determined to be an uncollected poem or verse by Dorothy Parker that you left out of Not Much Fun?

A:  No. I collected those items which I subjectively determined to be her poems and verses . . .

(Tr. 213.)  He was later asked the same question in a slightly different way:

The Court: Can you tell me any uncollected poems or verses that you determined were written by her that you left out of Not Much Fun? As you sit here today right now, do you remember any? It's a simple question.  The answer is yes, I do, or, no I don't.

A:  I collected everything I determined was a poem or a free verse.

(Tr. 221–22.)

Silverstein tried to distance himself from the meaning of the word "all" in the "Complete Chronology" by claiming that Gillian Blake had written the final version of the above-quoted introductory language. (Tr. 141.)  However, Blake's testimony made it clear that Silverstein in fact was the origin of the word "all."  (Tr. 140, 224–25, 229–31.)  Silverstein suggested the word "all" to Blake in a May 17, 1996 letter, which in pertinent part, reads: "[P]lease understand that this list provides publication information for *all* of Mrs. Parker's poems and verses, not only those contained in Not Much Fun." (PX 101.) (emphasis in original.)  In any event, Silverstein never objected to the language of the "Complete Chronology" nor did he attempt to change the language in subsequent printings of Not Much Fun. (Tr. 139, 142.)  He thereby represented to the world that his compilation, added to Parker's previous collections, contained all of her poems and verses.

Even before the "Sources" section was re-titled "Complete Chronology" and the word "all" was added to allay reviewers' confusion, the section still purported to contain "a complete chronological list of Dorothy Parker's poems." (PX 11.)  Silverstein tried to inject ambiguity into this statement by testifying that the word "complete" modified only the word "list" and not the word "poems."  Quite obviously, Silverstein described the list as complete because, by combining previously collected poems and verses with those collected in Not Much Fun, it was thought to catalogue all of Parker's poems and verses.

According to Silverstein, two sentences in the Introduction establish that Silverstein intended Not Much Fun to be a compilation of merely a selection of Parker's uncollected poems and verses, rather than a complete compilation.  A reading of the two sentences demonstrates that what is so clear to Silverstein is really not so clear at all:

Those precarious undertakings called "art" are considered and judged through intensely personal yet hazy prisms of emotion, taste and experience.  This collection will ultimately be measured on those grounds.  Enjoy.

(PX 2 at p. 65.)  This language from the Introduction does not negate the express language from the "Complete Chronology" and Silverstein's other statements that Not Much Fun contains all of Parker's uncollected poems and verses.  The Introduction itself contains statements representing the book as a complete anthology.  It states that Parker "collected most of [her poems and verses]—more than 200 in all—in her three books of original poetry and two subsequent compilations.  The *other* 122 poems and free verses—*the forgotten ones*—are collected here for the first time."  (PX 2 at p. 63 (emphasis added).)

The foregoing discussion shows that Silverstein consistently touted Not Much

*Fun* as a compilation of all of Parker's uncollected poems. The book itself expressly makes this claim in its title, introduction, and in the "Complete Chronology" section.

### F. *The Creation of Complete Poems*

In 1995, Penguin published *Dorothy Parker: Complete Stories ("Complete Stories")*, a complete anthology of Dorothy Parker's short stories. Around that time, Penguin had considered publishing a companion volume of Parker's complete poems. (Tr. 443.) However, it was not until 1997, after Penguin had already reviewed Silverstein's manuscript and Scribner had published *Not Much Fun*, that Penguin hired Professor Colleen Breese as an outside editor to create a manuscript for *Complete Poems*. (Breese Dep. Tr. 114–118.) Breese was supervised by Michael Millman, who in turn was supervised by Kathryn Court. The goal of *Complete Poems* was to make it, as its title suggests, as complete an anthology of Parker's poems as possible. Penguin therefore thought it necessary to include all of the previously uncollected poems that Silverstein had compiled in *Not Much Fun.* (Tr. 480, 519.)

*Complete Poems* is organized into six sections. Each of the first five sections is titled after one of Parker's own collections and contains the poems appearing in that collection. The sixth section, the one that contains 121 of 122 poems collected by Silverstein in *Not Much Fun*, is titled "Poems Uncollected by Parker." (PX 4,) Penguin did not title the sixth section after Silverstein's compilation as it had titled the first five sections after Parker's compilations. Penguin did not otherwise attribute Silverstein's book because it did not wish to direct its audience to the competition. (Tr. 482–83.) Penguin also provided retailers with a catalogue, called "Penguin Classics: A Complete Annotated Listing," describing the titles within the "Penguin Classics" brand. (Tr. 342, 492). The entry for *Complete Poems* described the book as follows: "The first complete edition of Parker's poetry brings together all of the poems published in *Enough Rope, Sunset Gun* and *Death and Taxes,* along with 100 other previously uncollected works." (PX 260, 261.)

To prepare the manuscript for *Complete Poems,* Ms. Breese cut and pasted or Xeroxed sheets directly from previous Parker compilations. (Breese Dep. Tr. 143–44, 156–58; Tr. 484.) Millman knew that Breese cut and pasted from books of Parker poems to prepare the *Complete Poems* manuscript. (Tr. 482.) Penguin representatives testified that this practice, known as using "tearsheets," is standard in the book-publishing industry. To avoid the risk of making mistakes by transcribing the text of the original work, manuscripts are prepared by photocopying from other books or sometimes even tearing books apart and pasting the pages onto a manuscript. (Tr. 482, 616–17.)

To prepare the sixth section, "Poems Uncollected by Parker," Breese purchased a hardcover copy of *Not Much Fun.* She cut and pasted the poems from *Not Much Fun* into the *Complete Poems* manuscript. Rather than creating a separate section for the "Hate Verses" as Silverstein had, she re-arranged all of the poems from *Not Much Fun* chronologically within the sixth section. (Breese Dep. Tr. 156–58.) Breese testified that she searched for additional uncollected Parker poems that Silverstein may have overlooked but did not locate any. (Breese Dep. Tr. 94–95.)

In 1999, after Breese had assembled what she and Millman believed to be all of Parker's known poems, Penguin published *Complete Poems,* which bore a copyright notice in the name of the NAACP. (PX 4.) Millman believed that *Complete Poems* was as complete as they could make it

because he was under the impression that *Not Much Fun* contained all of Parker's uncollected poems. He understood from discussions with Himmelrich, the NAACP's attorney, that there were no uncollected poems besides those published in *Not Much Fun*. (Tr. 480.) Himmelrich made this representation to Millman, and Himmelrich's understanding was based on correspondence with Silverstein himself. (Tr. 255–59, 470.) Penguin claims to have never asked permission from Silverstein to publish the poems from *Not Much Fun* in *Complete Poems* because everyone involved in the publication of *Complete Poems* reasoned that the poems belonged to Parker, not Silverstein. (Tr. 468–69.)

The Penguin employees involved in the making of *Complete Poems* did not know that Silverstein had made edits to some of the poems or that he had in fact given "After Dawn" and "Chris–Cross" their titles. Because Penguin simply photocopied pages from *Not Much Fun* to make the sixth section of *Complete Poems*, the poems in that section reproduced the edits made and titles given by Silverstein. (Tr. 486.) Nevertheless, a page of *Complete Poems* called "A Note on the Text" states that "[t]he poems that appear here are faithfully reproduced from Dorothy Parker's original collections ... and from *Bookman, Life, McCall's, Nation, New Republic, The New Yorker, New York Herald Tribune, New York World, Saturday Evening Post, Saturday Review, Vanity Fair, Vogue,* and *Yale Review*." (PX 4.)

### G. Silverstein Discovers Complete Poems

Silverstein first learned of *Complete Poems,* and that it included the poems from *Not Much Fun,* when he saw a copy and leafed through it in a bookstore in Los Angeles. (Tr. 147.) After this discovery, Silverstein contacted a lawyer. Glen Kulik. Mr. Kulik sent a demand letter to Penguin, dated May 17, 2000. The letter demanded that "Penguin immediately cease and desist the continued publication of *Complete Poems* and withdraw all unsold copies currently in circulation." (PX 121.) Penguin, through counsel, responded to the letter and denied liability. Believing that it had obtained all the necessary permissions to publish *Complete Poems,* Penguin has issued four more printings of *Complete Poems* since the date of Silverstein's demand letter. (Tr. 555–56, 616.) Silverstein filed the instant lawsuit in January of 2001.

### II. Conclusions of Law

The Court finds in favor of the defendant Penguin on all three bases of liability asserted in the complaint. Those three bases are: (1) copyright infringement under the Copyright Act, 17 U.S.C. § 103; (2) reverse passing off under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); and (3) unfair competition and unfair and immoral trade practices under New York state law. The Court also declines to consider Plaintiff's false promotion claims under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) because they were neither pleaded nor tried with the consent of the parties.

### A. Copyright Infringement

To prevail on a copyright infringement claim, a plaintiff must establish (1) ownership of a valid copyright and (2) copying of the constituent elements of the work that are original. *See Feist Publ'ns., Inc. v. Rural Tel. Serv. Co., Inc.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). As discussed below, the facts show that Silverstein owns no valid copyright in his compilation *Not Much Fun*. Therefore, this decision does not reach the second prong of the copyright infringement test.

A copyright registration is *prima facie* evidence of a valid copyright. *See* 17 U.S.C. § 410(c); *Folio Impressions, Inc. v. Byer Cal.,* 937 F.2d 759, 763 (2d Cir.1991).

It was never disputed that Silverstein registered a copyright for *Not Much Fun* with the Copyright Office. Therefore, at the outset of trial a rebuttable presumption existed that the book possessed a valid copyright and Penguin had the burden of rebutting this presumption.

■ Under the Copyright Act of 1976, a compilation is "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." 17 U.S.C. § 101. The Supreme Court in *Feist* articulated the level of copyright protection afforded to compilations: "A factual compilation is eligible for copyright if it features an original selection or arrangement of facts, but the copyright is limited to the particular selection or arrangement. In no event may the copyright extend to the facts themselves." 499 U.S. at 350–51, 111 S.Ct. 1282. For the selection or arrangement to be deemed "original," it must possess "at least some minimal degree of creativity." *Id.* at 345, 111 S.Ct. 1282.

On appeal, the Second Circuit narrowed Silverstein's potential claim to copyright protection in this case to his *selection* of works included in *Not Much Fun*. *Silverstein*, 368 F.3d at 84 ("[T]he only copyright claimed by Silverstein that Penguin arguably infringed is in the selection."). This means that *Not Much Fun* is only copyrightable if Silverstein exercised some creativity in his selection of works for the book.

■ In order to obtain copyright protection, a compilation must be guided by principles of selection other than all-inclusiveness. This is because the collection of "'all is not a selection.'" *Silverstein*, 368 F.3d at 85. If selections are made, the creative spark "inheres in making non-obvious choices from among more than a few options." *Matthew Bender & Co. v.*

*West Publ'g Co.*, 158 F.3d 674, 682 (2d Cir.1998). A compilation may lack the requisite creativity where: "(1) industry conventions or other external factors dictate selection so that any person compiling facts of that type would necessarily select the same categories of information; (2) the author made obvious, garden-variety, or routine selections, or (3) the author has a very limited number of options available." *O.P. Solutions Inc. v. Intellectual Property Network Ltd.*, 52 U.S.P.Q.2d 1818, 1823 (S.D.N.Y. Oct.21, 1999) (Preska, J.) (citing *Matthew Bender & Co.*, 158 F.3d at 682–83).

■ The evidence adduced at trial establishes that Silverstein was guided only by the principle of all-inclusiveness in compiling *Not Much Fun*. His admitted purpose was to gather as many uncollected Parker poems and verse as he could find. He did not select the 122 poems and verses that he determined to be the best of a larger pool of Parker's uncollected poems. By his own testimony, he selected every item that he determined to be a poem or verse written by Parker that had not been previously collected. His book announced this to the world: these are "the lost poems of Dorothy Parker," this is the "complete chronology," and it includes "all" of Parker's poems and verses.

■ Silverstein's essential claim is that, because he asserts that identifying something as a poem is an inherently subjective decision, he could have potentially classified any Parker work as a poem. Therefore, numerous viable selection options existed and he chose merely a subset of eligible works. In reality, Silverstein used a conventional definition of "poem" that anyone would have used, and this limited the works that he could plausibly classify as poems. He included every poem that met this conventional definition. Silver-

stein's choices were obvious ones that required no creative judgment.

The obviousness of Silverstein's choices is reflected in the fact that every poem he included is objectively recognizable as a poem. As originally published, each item contains several or all of the characteristics typical of a poem: indentation from the margins; organization into stanzas; metered lines; arrangement of those lines into a rhyme scheme. The evidence shows that Silverstein referred solely to these objective criteria in identifying poems.

The testimony of Professor Calhoun confirmed that every poem Silverstein included is objectively recognizable as a poem. The trivial differences in classification between Calhoun's *Bio–Bibliography* and *Not Much Fun* do not suggest creative judgment on the part of Silverstein. Calhoun omitted the six works that Silverstein included because Calhoun did not double count poems embedded in larger works that fit another category, because he needed more historical facts to attribute authorship, or because he did not know of the poem. Calhoun does indeed consider each of the omitted works, along with every other work included in *Not Much Fun*, to be a poem that naturally should be included in a collection of all of Parker's poems.

As for the three items Silverstein excluded from *Not Much Fun* that Calhoun classified as poems in his *Bio–Bibliography*, one item, "Playing Safe," Calhoun listed as a poem by mistake. The second, "Higgledy Piggledy," Silverstein now agrees is a poem that he should have included in *Not Much Fun*. Calhoun testified that the third item, "Song Sheet," is an anomalous item, and he would not disagree with an editor who excluded it from a collection of poems. Thus, the sole item on which Silverstein and Calhoun have somewhat differing opinions is "Song Sheet." Silverstein's decision that song lyrics are not poems was not a creative principle underlying his compilation that imbues it with the originality required for copyright protection.

*Not Much Fun* is an exhaustive compilation of Parker's uncollected poems. Silverstein employed significant time, personal resources, and patience in making *Not Much Fun*. His efforts will likely advance the understanding and study of Dorothy Parker, an important American literary figure. Yet it was Silverstein's so-called "sweat of the brow," not his creativity, that led to the creation of *Not Much Fun*. Efforts of this kind are not the object of the copyright laws. As the Supreme Court has acknowledged, "It may seem unfair that much of the fruit of the compiler's labor may be used by others without compensation." *Feist*, 499 U.S. at 349, 111 S.Ct. 1282. The copyright laws serve their goal of promoting science and art by according protection not to the author's labor alone, but to creative expression produced by that labor. The Court's finding that *Not Much Fun* lacks creativity compels the conclusion that it is not entitled to copyright protection.

**B. *Lanham Act Claims***

Silverstein's complaint alleges reverse passing off under Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A). The Court finds that this claim is precluded by the Supreme Court's 2003 decision in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 123 S.Ct. 2041, 156 L.Ed.2d 18 (2003). On the eve of trial, after six years of litigation, Silverstein additionally sought to raise without ever amending his complaint two unpleaded false promotion claims under Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B). For the reasons stated below, under Federal Rule of Civil Procedure 15(b) Silverstein's complaint may not be amended to conform to the evidence of these unpleaded claims.

## 1. The Reverse Passing Off Claim

■ Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), provides a federal civil remedy against one who makes a "false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which ... is likely to cause confusion ... as to the origin ... of his or her goods." The term "origin" refers not only to geographical origin but also to the origin of manufacture. *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 30–31, 123 S.Ct. 2041, 156 L.Ed.2d 18 (2003). Thus, a claim of reverse passing off—where defendant has misrepresented someone else's goods or services as his own—is actionable under § 1125(a)(1)(A).[11] *Id.* at 28 n. 1, 31, 123 S.Ct. 2041.

In 2003, while this case was pending, the Supreme Court in *Dastar* issued an interpretation of § 1125(a)(1)(A) that precludes Silverstein's claim for reverse passing off. In *Dastar*, the plaintiff brought a reverse passing off claim against Dastar Corp., distributor of the "Campaign" videos, which were about the allied campaign in Europe during World War II. *Id.* at 26–28, 123 S.Ct. 2041. The Campaign videos included footage from the "Crusade" television series but neglected to attribute the television series as the origin of this footage. *Id.* The Court held that

reading the phrase "origin of goods" in the Lanham Act in accordance with the Act's common-law foundations (which

were *not* designed to protect originality or creativity), and in light of the copyright and patent laws (which *were*), we conclude that the phrase refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods.

*Id.* at 37, 123 S.Ct. 2041. In other words, the author of ideas that are reproduced in tangible products such as films and books is not the "origin of goods" within the meaning of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A). As a result, such an author may not claim that the producer of the tangible product, by reproducing the author's ideas without proper attribution, has committed an actionable "false designation of origin." *Id.*

*Dastar* forecloses upon the claim that Penguin, by reproducing Silverstein's compilation of poems in the sixth section of *Complete Poems,* is liable to him for reverse passing off. Penguin, and not Silverstein, is the producer of the tangible product offered for sale in this case, the book *Complete Poems.* Penguin could not falsely claim to be the origin of the book for the purposes of 15 U.S.C. § 1125(a)(1)(A).

Silverstein attempts to sustain his reverse passing off claim by arguing that the rule laid down in *Dastar* applies only to non-copyrighted works. Passing off the copyrighted expressions of an author as one's own, Silverstein asserts, remains a viable Lanham Act claim.[12] As this Court

**11.** "Passing off"—where defendant falsely claims that its goods were produced by another—is also actionable under this provision. *Dastar,* 539 U.S. at 27 n. 1, 123 S.Ct. 2041.

**12.** The footage at issue in *Dastar* did happen to be in the public domain when the defendant distributed the videos reproducing that footage. However, *Dastar's* holding does not seem to turn on the copyright status of the reproduced material. *See Dastar Corp.,* 539

U.S. at 37, 123 S.Ct. 2041 (stating that the holding applies to "the author of *any* idea, concept, or communication embodied in those goods" (emphasis added)). Indeed, the Supreme Court implied that the copyright laws would supply the sole protection when an author's ideas are reverse passed off. *Id.* (stating that "[t]he creative talent of the sort that lay behind the Campaigns videos is not left without protection" because "[h]ad [plaintiff] renewed the copyright in the Cru-

has found that Silverstein's compilation is not entitled to copyright protection, it need not resolve this question. Penguin is not liable to Silverstein for reverse passing off under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

### 2. The False Promotion Claims

Silverstein asserted for the first time in his pre-trial memorandum an "independent and alternative" claim for false promotion under Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B). (Pltff's Pre–Trial Mem. at 46–48). This provision provides a federal cause of action to persons injured by a false statement of fact "in commercial advertising or promotion, [that] misrepresents the nature, characteristics, qualities, or geographic origin of [the defendant's] or another person's goods...." 15 U.S.C.A. § 1125(a)(1)(B).

The basis of Silverstein's claim, according to his pre-trial memorandum, is the sentence in *Complete Poem's* "Note on the Text" that states that the poems collected therein were "faithfully reproduced" from their original publications and collections. At trial, Silverstein also introduced two exhibits, which were not listed in his proposed pre-trial order, from a catalogue titled "Penguin Classics: A Complete Annotated Listing." The catalogue entry for *Complete Poems* describes the book as follows: "The first complete edition of Parker's poetry brings together all of the poems published in *Enough Rope, Sunset Gun* and *Death and Taxes*, along with 100 other previously uncollected works." In

his proposed findings of fact and conclusions of law submitted after trial, Silverstein asserts false promotion claims under § 1125(a)(1)(B) based on the statements contained in both documents. (Pltff's Post–Trial Br. 57–58).

The parties failed to reach agreement on a pre-trial order, and the trial proceeded without one ever being reached. At trial, over Penguin's objection, Silverstein's attorneys offered into evidence and elicited testimony from Silverstein and Millman about the "Note on the Text." He offered the pages of the Penguin Classics catalogues into evidence without objection and questioned two of the testifying Penguin employees about it.

Penguin claims that the Court should not consider either of the false promotion claims because they were not pleaded, Penguin never consented to their trial, and because their trial would cause Penguin prejudice. (Defendant's Post–Trial Br. at 55–56, 59, 63). At oral argument, Silverstein asserted that his complaint sufficiently pleaded claims for false promotion under 15 U.S.C. § 1125(a)(1)(B) and, in the alternative, that the unpleaded claims should be considered pursuant to Federal Rule of Civil Procedure 15(b). (Oral Arg. Tr. 16–17).[13] As discussed below, the Court finds that Silverstein did not plead false promotion in his complaint. Further, Rule 15(b) does not permit amendment of the complaint to include these unpleaded claims because Penguin never consented to

sade television series, it would have had an easy claim of copyright infringement"). Several lower court decisions have rejected a distinction based on copyright status. *See Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 148–49 (5th Cir.2004)(applying *Dastar* to a claim regarding copyrighted work); *A Slice of Pie Prods., LLC v. Wayans Bros. Entm't*, 392 F.Supp.2d 297, 313 (D.Conn.2005)("In fact, *Dastar* progeny have expressly rejected plain-

tiff's copyright/no copyright distinction and applied *Dastar* to claims concerning copyrighted works."), *Williams v. UMG Recordings, Inc.*, 281 F.Supp.2d 1177, 1185 (C.D.Cal.2003)("To the contrary, the Supreme Court's holding did not depend on whether the works were copyrighted or not.").

**13.** "Oral Arg. Tr." refers to the transcript of the oral argument heard on October 9, 2007.

their trial and because Penguin would be prejudiced by such amendment.

### a. *The Complaint*

█ Silverstein has taken the position that his complaint sufficiently raises the false promotion claim. The complaint alleges that Penguin "passed off plaintiff's work as its own, rather than that of the plaintiff, and thereby violated the Lanham Act, 15 U.S.C. § 1125." (Amended Compl. ¶ 20.) Although the reference to " § 1125" is general enough to refer potentially to a reverse passing off claim under subsection 1125(a)(1)(A) or a false promotion claim under subsection 1125(a)(1)(B), the complaint as drafted fails to allege a false promotion claim for two reasons.[14]

First, the complaint makes specific reference only to passing off, implying that this was the only theory of liability upon which Silverstein was relying. This implication is confirmed by the fact that, in six years of litigation, during the course of which Silverstein saw his § 1125 claim granted on summary judgment by this Court, reversed and remanded by the Second Circuit, and denied summary judgment on a renewed motion, Silverstein has only asserted a reverse passing off theory. He never mentioned false promotion until his pre-trial memorandum, which he filed two weeks before trial.

Second, the complaint fails to allege any false statement of fact by Penguin at all, much less one made in commercial advertising or promotion. *See Gmurzynska v. Hutton*, 355 F.3d 206, 210 (2d Cir.2004) (stating that the complaint fails to plead false promotion where it does not allege any false statement made in commercial advertising or promotion). Instead, Silverstein pled his § 1125 cause of action by merely incorporating by reference the allegations of copyright infringement, (Amended Compl. ¶ 18), and claiming that Penguin passed off his work as its own. (*Id.* ¶¶ 19–20). The complaint makes no mention of the allegedly false statements in the "Note on the Text" or in the "Penguin Classics" catalogues, or any others.

Even under the liberal notice pleading standard of Federal Rule of Civil Procedure 8(a)(2), the complaint did not give fair notice to Penguin that a false promotion claim was being asserted or the grounds upon which such a claim might rest. *See Bell Atl. Corp. v. Twombly*, ——— U.S. ———, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007) ("Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which is rests.'" (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80, (1957))). Therefore, the Court finds that Silverstein's complaint fails to plead a false promotion claim.

### b. *Rule 15(b) Amendment*

█ At no point in the litigation did Silverstein seek to amend his complaint to add either of the false promotion claims that he asserts in his post-trial submission. The Court construes his belated assertion of them as a request to amend his complaint to conform to the evidence pursuant to Federal Rule of Civil Procedure 15(b). Rule 15(b) states that "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." A

---

**14.** Indeed, § 1125 actually provides several other causes of action such as trademark dilution, subsection 1125(c), and cyberpiracy, subsection 1125(d). Under Silverstein's reasoning, the complaint as drafted could potentially refer to these claims as well. However, he has never asserted them as they are obviously inapplicable to this case.

party can seek to amend his pleadings at any time—even after judgment—to cause them to conform to the evidence presented. No motion or formal amendment is necessary, however, because "failure so to amend does not affect the result of the trial of these issues." Fed.R.Civ.P. 15(b).

In deciding whether to allow amendment under Rule 15(b), the essential questions are "whether the new issues were tried by the parties' express or implied consent and whether the defendant 'would be prejudiced by the implied amendment, i.e., whether he had a fair opportunity to defend and whether he could offer any additional evidence if the case were to be retried on a different theory.'" *Royal Am. Managers, Inc. v. IRC Holding Corp.,* 885 F.2d 1011, 1017 (2d Cir.1989) (quoting *Browning Debenture Holders' Comm. v. DASA Corp.,* 560 F.2d 1078, 1086 (2d Cir. 1977)). Rule 15(b) permits amendment only when the unpleaded issues are tried with the express or implied consent of the parties. *Luria Bros. & Co., Inc. v. Alliance Assur. Co., Ltd.,* 780 F.2d 1082, 1089 (2d Cir.1986) (stating that "the crucial test is whether the parties have consented to litigation of the issue"). Where there is no express consent, consent often may be implied from the opposing party's failure to object to the admission of evidence relevant to the unpleaded issue. *Id.* (citing *Usery v. Marquette Cement Manufacturing Co.,* 568 F.2d 902, 906 (2d Cir.1977)). However, consent will not be implied from the failure to object to evidence that is relevant to both pleaded and unpleaded issues, unless it was somehow obvious that the party offering the evidence was attempting to raise the unpleaded issue. *Luria Bros.,* 780 F.2d at 1089. Courts have also held that consent may be implied if the claim is somehow "introduced outside the complaint-say, by means of a sufficiently pointed interrogatory answer or in a pretrial memorandum-and then treated by the opposing party as having been pleaded, either through his effective engagement of the claim or through his silent acquiescence." *Rodriguez v. Doral Mortg. Corp.,* 57 F.3d 1168, 1172 (1st Cir.1995); *see also Isik Jewelry v. Mars Media, Inc.,* 418 F.Supp.2d 112, 131 (E.D.N.Y.2005) ("By engaging a theory of liability in a 'pretrial memorandum,' [defendant] impliedly consents to this Court's consideration of [the unpleaded issue].").

The prejudice inquiry is a "key question" when considering whether to permit Rule 15(b) amendment. *Marquette Cement,* 568 F.2d at 907. Prejudice does not result simply because the amendment would change the cause of action. *See id.* (quoting 3 Moore's Federal Practice, ¶ 15.13(2), at 984 (2d ed.1974)). In determining whether the objecting party would be prejudiced by allowing the amendment, courts must consider whether the failure to plead the claim raised at trial disadvantaged the opponent in presenting its case. *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 569 (2d Cir.2000). Relevant to this analysis is whether the unpleaded claim involves the same material facts as the pleaded claims, *see, e.g., New York State Elec. & Gas Corp. v. Sec'y of Labor,* 88 F.3d 98, 105 (2d Cir.1996), and whether, in fairness, the objecting party should have had an opportunity to better contest the unpleaded claim by, for example, exploring defenses to it in pre-trial discovery, *see, e.g., Luria Bros.,* 780 F.2d at 1089–90, or by presenting more evidence on it at trial. *See, e.g., 890 Noyac Rd., Noyac, New York,* 945 F.2d at 1259.

The Court will conduct the consent and prejudice inquiries with respect to both of the false promotion claims.

### i. *"A Note on the Text"*

▇ The Court finds that Penguin did not consent, either expressly or implicitly, to the trial of whether the sentence in the

"Note on the Text"—that the poems were "faithfully reproduced" even though they contained Silverstein's copyedits—constituted false promotion. Penguin never gave express consent to the trial of this claim. In his proposed pre-trial order, Silverstein stated that false promotion based on the "Note on the Text" was a legal issue to be decided at trial. (Pltff's Proposed Pre–Trial Order, Schedule F. ¶ 19). In contrast, Penguin's proposed pre-trial order refused to recognize that this claim was before the Court. It stated that the sole legal issue with respect to the Lanham Act to be decided was "*[w]nether Silverstein's Second Cause of Action, for reverse passing off under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125, survives the Supreme Court's decision in [Dastar].*" (Defendant's Proposed Pre–Trial Order at 35 (emphasis in original)). Five days before trial, as the parties continued to argue over a joint pre-trial order, Penguin sent a letter to the Court, with a copy to opposing counsel. Citing the false promotion claim raised in Plaintiff's proposed pre-trial order, Penguin stated that "[a]ny matters relating to the copyediting claim are out of this case for all purposes, and any attempt to inject them into the trial would be clear error." (Defendant's Letter to the Court, July 12, 2007, at 2). The parties ultimately failed to reach agreement on a joint pre-trial order, and the trial proceeded without one. Penguin thereby expressly rejected Silverstein's attempt to raise at the last minute a false promotion claim based on the "Note on the Text."

Nor can consent be implied from Penguin's conduct at trial. The "Note on the Text," which is a single page in *Complete Poems,* was not listed as a separate exhibit in Silverstein's proposed pre-trial order apart from the book, which was listed as Exhibit 4. When Silverstein's counsel attempted to elicit testimony from Silverstein about the specific page upon which the "Note on the Text" appears, Penguin objected. Penguin's stated reason for objecting was that the "Note on the Text is just a corollary to the copy editing claim which has been dismissed." (Tr. 157). This statement makes it clear that Penguin understood the "Note on the Text" only to be relevant to the theory of copyright infringement that the Second Circuit had estopped Silverstein from relying upon in its opinion remanding the case for trial. *See Silverstein,* 368 F.3d at 83. Penguin did not understand the evidence to be relevant to any valid issue within the complaint, and accordingly objected numerous times. (Tr. 157, 158, 160, 491). It therefore did not implicitly consent to the trial of a false promotion claim based on this piece of evidence.

The Court refuses to imply Penguin's consent from Silverstein's unilateral actions. Silverstein did argue in his pre-trial memorandum that the statement in the "Note on the Text" constituted false promotion. Penguin did not then treat this issue as if it had been pled, "either through [its] effective engagement of the claim or through [its] silent acquiescence." *Rodriguez,* 57 F.3d at 1172. Penguin did not respond to this claim in its pre-trial memorandum at all. As discussed above, Penguin refused to consent to a pre-trial order listing the claim as an issue for trial and objected to the relevance of the evidence offered to prove it. Nor does the fact that Silverstein's attorney alluded to this issue in his opening statement, (Tr. 3), suggest Penguin's consent to its trial.

The absence of implied consent is confirmed by comparison of this case to a 1991 case in which the Second Circuit found implied consent lacking. *U.S. v. Certain Real Property and Premises, Known as 890 Noyac Rd., Noyac, New York,* 945 F.2d 1252 (2d Cir.1991). In that case, a civil forfeiture action, the Second Circuit

held that a district court abused its discretion in amending the complaint to conform to evidence presented that the owner knew of drug activity after the date of her son's arrest, where the complaint had alleged only pre-arrest knowledge. The Court found no implicit consent to the trial of the issue of post-arrest knowledge, even though the pre-trial order had alleged post-arrest knowledge. The defendant did not object to evidence of post-arrest knowledge on the grounds that post-arrest knowledge was irrelevant to the allegations within the complaint. The defendant objected on constitutional grounds alone, but the Second Circuit stated that "We are nonetheless loath to construe a motion to exclude evidence as a consent to its admission, at least in the circumstances presented here," where the evidence was potentially relevant on other grounds besides post-arrest knowledge. Finally, the defendant even offered direct testimony to rebut the claim of post-arrest knowledge. Despite all this, the Court concluded that "the overall picture as to consent is at best rather confused." *Id.* at 1258.

Against this backdrop, the overall picture as to consent in this case is fairly clear. Penguin (1) refused to consent to a pre-trial order raising the unpleaded false promotion claim; (2) objected that the evidence offered to support this unpleaded claim was irrelevant to any issue in the case; and (3) offered no evidence to defend against a false promotion claim. From this, the Court concludes that Penguin did not implicitly consent to the trial of a false promotion claim based on the "Note on the Text."

The Court now turns to the prejudice inquiry. As Penguin never consented to the trial of this issue, it accordingly never presented evidence to refute the elements of a false promotion claim. The Court's consideration of this claim by way of a post-trial Rule 15(b) amendment would not merely disadvantage Penguin but would completely deprive it of the opportunity to contest the merits of this claim. This would certainly cause prejudice to Penguin.

Establishing or defending a false promotion claim calls for proof of material facts different than the facts material to the copyright and reverse passing off claims raised in Silverstein's complaint. For example, to prevail on a false promotion claim, Silverstein would have to prove that the alleged misrepresentation was made in the context of "commercial advertising or promotion," which is "commercial speech" made "for the purpose of influencing consumers to buy defendant's goods or services" that is "disseminated sufficiently to the relevant purchasing public." *See Gmurzynska v. Hutton,* 355 F.3d 206, 210 (2d Cir.2004) (citing *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.,* 314 F.3d 48, 56, 57–58 (2d Cir.2002)). Had Penguin consented to the trial of this claim, it would have undoubtedly presented evidence challenging this element on the grounds that the "Note on the Text," which is a single interior page in a four hundred page book, was neither intended nor likely to influence consumers' decisions to buy the book. The Court expresses no opinion on the merits of Penguin's hypothetical defense to this claim. Yet it would be unfair to consider the unpleaded claim when Penguin has neither consented to nor defended against it.

### ii. The "Penguin Classics" catalogues

The Court finds no implicit consent to the trial of whether the statement in the Penguin Classics catalogues—that *Complete Poems* contains "100 other previously uncollected works"—amounted to false promotion under 1125(a)(1)(B). Penguin did not even have notice that such a claim

was being asserted. Silverstein did not raise it in his pre-trial memorandum or in his proposed pre-trial order. He did not even list the catalogues as exhibits in the proposed pre-trial order that he filed with the Court.[15]

Without notice of this claim, the Court cannot imply Penguin's consent to try it from the mere fact that Penguin did not object to the admission of the catalogue exhibits as evidence at trial. The statement in the catalogues, that the poems were previously uncollected, is a failure to attribute Silverstein's work and is directly relevant to his pleaded reverse passing off claim. Silverstein did ask von Mehren and Millman about whether the catalogue was used to promote Penguin's books, including *Complete Poems*. (Tr. 341–432, 492). In retrospect, one can see that Silverstein was building a false promotion case at that time. However, at the time Silverstein offered and elicited testimony about the catalogue exhibits, it was in no way obvious that he sought to raise a new claim rather than support the reverse passing off claim alleged in his complaint. Frankly, the Court did not understand Silverstein to be raising this false promotion claim at trial and was surprised to see it in his post-trial submission. Consent to the trial of this claim cannot be inferred from Penguin's failure to object to the catalogues because they were unobjectionably relevant to the pleaded reverse passing off claim. *See Luria Bros.*, 780 F.2d at 1089.

Penguin would also be prejudiced by allowing a Rule 15(b) amendment to the pleadings to add a false promotion claim based on the statement in the catalogues. The Court "decline[s] to speculate about how [defendant] might have dealt with the issue ... had it been squarely presented."

*890 Noyac Rd., Noyac, New York*, 945 F.2d at 1259. However, the Penguin employees who testified at trial were not directly involved in creating the "Penguin Classics" catalogues or marketing those titles, which were handled by Penguin's academic marketing department. (Tr. 341–42, 492, 494). At the very least, Penguin should have had the opportunity to present witnesses knowledgeable about the catalogues that allegedly contain the misrepresentations and give rise to liability.

Instead, Penguin was undoubtedly lulled into thinking that evidence regarding nonattribution went solely to a reverse passing off claim, the only Lanham Act claim raised by Silverstein's complaint. More than four years have passed since *Dastar* sunk Silverstein's reverse passing off claim, although Silverstein has never acknowledged it. Had Penguin known that Silverstein would ultimately seek to hold it liable under a false promotion theory, it likely would have devoted more attention to its Lanham Act defense because certain false promotion claims may survive *Dastar. See Dastar*, 539 U.S. at 38, 123 S.Ct. 2041. *But see, e.g., Radolf v. University of Conn.*, 364 F.Supp.2d 204, 221 (D.Conn. 2005) (finding false promotion claim precluded by *Dastar* where the alleged misrepresentation is a false attribution of authorship); *Thomas Publ'g Co., LLC v. Tech. Eval. Cntrs., Inc.*, No. 06 Civ. 14212, 2007 WL 21939664, *3 (S.D.N.Y July 27, 2007)(same). Penguin would therefore be prejudiced by a post-trial amendment allowing the claim.

In sum, Rule 15(b) amendment is inappropriate because the parties never consented to the trial of the false promotion

---

**15.** Penguin represents that Silverstein served it with an amended exhibit list adding these exhibits five days before trial. (Defendant's Post–Trial Br. 63). Penguin could not have interpreted the addition of two exhibits to a list of over 250 as an assertion of a brand new claim.

claims and because such amendment would prejudice the defendant.

### C. *Silverstein's State Law Claims*

Silverstein also claims that Penguin is liable under New York state law for unfair and immoral trade practices and unfair competition. These claims are based on Penguin's reproduction of *Not Much Fun's* selection of poems in *Complete Poems* and passing off that selection as Penguin's own. (Amended Complaint ¶¶ 21–23.) The Court finds that these state law claims are preempted by the Copyright Act.

■ The Copyright Act preempts a state law claim when: (1) the particular work to which the claim is being applied falls within the type of works protected by the Copyright Act and (2) the claim seeks to vindicate legal or equitable rights that are equivalent to one of the exclusive rights already protected by copyright law. *Briarpatch Ltd. v. Phoenix Pictures,* 373 F.3d 296, 305 (2d Cir.2004); *see* 17 U.S.C. § 301(a)(copyright law preempts any claim that seeks to enforce a right that is "equivalent to any of the exclusive rights within the general scope of copyright"). The two prongs of this test are respectively called the "subject matter requirement" and the "general scope requirement." *Briarpatch,* 373 F.3d at 305.

■ The subject matter requirement is met "if the claim applies to a work of authorship fixed in a tangible medium of expression and falling within the ambit of one of the categories of copyrightable works." *Id.* Compilations make up a category of works of authorship that are copyrightable. 17 U.S.C.A. § 103(a). Therefore, Silverstein' state law claims, which apply to his compilation *Not Much Fun,* satisfy the subject matter requirement.

The general scope requirement is met when the act alleged to have breached the state-created right would, by itself, infringe one of the exclusive rights provided by the Copyright Act. *Briarpatch,* 373 F.3d at 305. The state law claim must therefore "involve acts of reproduction, adaptation, performance, distribution or display" and must not include any "extra elements that make it qualitatively different from a copyright infringement claim." *Id.* Courts in the Second Circuit take a "restrictive view" of what extra elements make a state law claim qualitatively different, looking at "what [the] plaintiff seeks to protect, the theories in which the matter is thought to be protected and the rights sought to be enforced." *Id.* at 306 (*quoting Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 982 F.2d 693, 716 (2d Cir.1992)).

Unfair competition claims "grounded solely in the copying of a plaintiff's protected expression" are preempted by section 301 of the Copyright Act because they contain no extra element. *Kregos v. Assoc. Press,* 3 F.3d 656, 666 (2d Cir.1993)(citing *Computer Assocs. Int'l,* 982 F.2d at 717). It is well-settled that a claim for reverse passing off predicated on the theory that defendant's product replicates plaintiff's expressions contains no extra element and is therefore preempted. *Integrative Nutrition, Inc. v. Academy of Healing Nutrition,* 476 F.Supp.2d 291, 297 (S.D.N.Y.2007) ("[P]laintiff's unfair competition claim is predicated on a theory of reverse passing off and contains 'no element to qualitatively differentiate it from those areas protected by copyright.'" (quoting *Kregos,* 3 F.3d at 666.)); *Am. Movie Classics Co. v. Turner Entertainment Co.,* 922 F.Supp. 926, 934 (S.D.N.Y. 1996) (stating that a " 'reverse passing off' P claim is equivalent to a claim for copyright infringement"); *Thomas Publ'g Co., LLC v. Tech. Eval. Cntrs., Inc.,* No, 06 Civ. 14212, 2007 WL 2193964, *4 (S.D.N.Y July 27, 2007) ("The Court finds no such 'extra element' here, as Plaintiff's allegations are premised upon reverse passing off."). Silverstein's state law claims are based on

Penguin's sale of a book that reproduced Silverstein's selection of Parker poems. The allegation that Penguin also misrepresented that selection as its own does not transform the claim into one qualitatively different from a copyright claim. This is because the mere reproduction of Plaintiff's expressions, even without misrepresentation of authorship, would support a claim under New York's law of unfair competition. *Kregos*, 3 F.3d at 666.

■ Moreover, the allegation that the reproduction was immoral does not differentiate the claim from one of copyright infringement. The Second Circuit has held that New York's "misappropriation doctrine based on amorphous concepts such as 'commercial immorality' or society's 'ethics' is preempted" because "[s]uch concepts are virtually synonymous for wrongful copying and are in no meaningful fashion distinguishable from infringement of a copyright" *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 851 (2d Cir. 1997).

Plaintiff cites case law holding that a "passing off" claim—where defendant represents its own product to be produced by the plaintiff—is not preempted. *See Fun–Damental Too, Ltd. v. Gemmy Indus. Corp.*, No. 96 Civ. 1103, 1996 WL 724734, *3 (S.D.N.Y. Dec. 17, 1996) (citing *Warner Bros. v. Am. Broad. Co.*, 720 F.2d 231, 247 (2d Cir.1983)). Yet Plaintiff's "attempt to rescue [his] unfair competition claim by seizing on the 'passing off cases is unavailing.'" *Am. Movie Classics Co.*, 922 F.Supp. at 933. Unlike a reverse passing off claim, a passing off claim does not involve acts of reproduction and does require proof of defendant's misrepresentation in order to be actionable under state law. *See id.* Therefore, a passing off claim is qualitatively different from a copyright infringement claim and is not preempted. Professor Nimmer explains the distinction as follows:

If A claims that B is selling B's products and representing to the public that they are A's, that is passing off. If, by contrast, B is selling B's products and representing to the public that they are B's, that is not passing off. A claim that the latter activity is actionable because B's product replicates A's, even if denominated "passing off," is in fact a disguised copyright infringement claim, and hence preempted.

1–1 Nimmer on Copyright § 1.01[B][1][e], *quoted in Am. Movie Classics*, 922 F.Supp. at 934. Silverstein cannot allege a passing off claim because Penguin has not misrepresented *Complete Poems* to be the work of Silverstein or any one else.

Silverstein's state law claims are based solely on Penguin's copying of his selection of Parker poems without attribution. Therefore, they are disguised copyright claims preempted by § 301(a) of the Copyright Act.

### Conclusion

The Court finds the defendant not liable on all three causes of action alleged in the complaint—copyright infringement, reverse passing off under the Lanham Act, and unfair and immoral trade practices and unfair competition under New York state law.

The complaint is dismissed. Judgment is entered for the defendant and the case is ordered removed from the docket of this Court.

**SO ORDERED.**